McIntyre, Francesa., J.
INTRODUCTION
The Boston Herald, Inc. and its two longtime columnists, Gayle Fee and Laura Raposa, wrote and published three stories in 2007 regarding the suicide of Brad Delp, the lead singer of the band “Boston.” Allegedly, the articles relied on information from Delp’s ex-wife, Micki Delp, and various unnamed “insiders” and “friends.” Donald Thomas Scholz, the founder of Boston, brought defamation claims against the defendants for these articles, claiming that the articles insinuated that Scholz caused Delp to commit suicide. The defendants now move for summary judgment. The defendants’ Motion for Summary Judgment will be ALLOWED, based on the following reasoning, which is offered at the outset without citation.
Suicide is a tragedy for many reasons, one being the lingering question of why? with which the survivors must grapple. No one ever knows what actually motivated the person—in that last tortured moment—to end his life. Here, the defendants published the opinions of others and insinuated their own as to why Brad Delp killed himself.
While such opinions may have abounded at the time, Delp’s final mental state is truly unknowable; it can never be objectively verified. The law dictates that defamation will only lie against a media defendant where the falsify of an assertion can be proven. Despite the amassing of powerful evidence of Delp’s mental state, the plaintiffs cannot prove or disprove the actual cause of his suicide. That secret went to the grave with him. Any views on the subject would necessarily be opinions.
Defamation redresses the publication of false facts. An opinion cannot be false; the free expression of opinion on any matter of public interest is constitu *316 tionally protected by the First Amendment. Therefore, the publication by these media defendants of their opinion about the cause of Delp’s suicide is not vulnerable to a claim of defamation. For this reason, summary judgment is granted to the defendants on both counts.
FACTUAL BACKGROUND
The following undisputed facts are drawn from the summary judgment record, and are viewed in a light most favorable to the non-moving party.
Scholz, a rock musician, composer, record engineer, and record producer, is an M.I.T. graduate, who in 1975 or thereabouts, founded the rock music group “Boston.” Scholz was the leader of the band and Brad Delp the lead singer. After CBS/Epic Records entered into a record contract with Scholz and Delp, Scholz hired Barry Goudreau, Sib Hashian, and Fran Sheehan in other roles. Around thirty years ago, there was a falling out between Scholz and the trio of Goudreau, Hashian, and Sheehan, with Delp allegedly endeavoring to maintain his ties to each side until his death. A singer named Fran Cosmo and his son joined the band; Brad was dependent on Cosmo’s voice as back-up to his own.
In late 2006, Scholz informed Delp that Boston would be doing a summer tour and rehearsals were to begin on March 24, 2007. On Februaiy 28, 2007, Scholz advised Delp that the initial summer performances had been confirmed. Cosmo, the back-up singer to Delp, was to tour with the band but that invitation was later rescinded. On March 1, 2007, Scholz emailed Delp indicating the tour was not confirmed. On March 9, 2007, Delp committed suicide.
Delp had a long history of anxiety and depression. He had suffered stage fright before concert performances with Boston and RTZ, another band with whom he toured in the early 1990s. He was prescribed Xanax in 1991 but his depression persisted. In 1991, Delp’s second wife, Micki Delp, separated from him, ultimately divorcing him in 1996 because of his mental health issues.[1]
In 2000, Brad became romantically involved with Pam Sullivan. They became engaged on Christmas Day 2006, and set a wedding date for August 2007. Pam’s younger sister, Meg Sullivan, lived in Brad’s home.
Nine days before Brad’s suicide, Meg discovered that he had taped a small camera to the ceiling of her bedroom. Thereafter, Brad sent emails to Meg and her boyfriend, Todd Winmill, voicing his sorrow over having “victimized” her. He wrote that he had “committed the most egregious sin against her.” Meg was concerned that Brad was going to do something harmful to himself. Delp responded that “I don’t think anyone could think less of me as a person as I am feeling about myself at this moment.” Two days later, Delp told Pam about his invasion of Meg’s privacy. Pam, too, feared that Delp would do something to harm himself.
On March 8, 2007, Delp purchased two charcoal grills that he employed on the following day to asphyxiate himself by carbon monoxide poisoning. He had also attached a dryer hose to his automobile as a “back up plan.” Delp left a suicide note for Pam, for Meg and Winmill, for his two adult children, and for his ex-wife Micki. He also left two public notes.
The Herald’s “Inside Track” is a column written by defendants, Fee and Raposa, that covers entertainment news. On March 15, 2007, the defendants wrote and published an article titled “Suicide Confirmed in Delp’s Death.” Fee has testified that the unnamed insiders mentioned in the article were Ernest Boch, Jr. and Paul Geary. On the same day, Fee appeared on WAAF radio. There, she stated that Scholz had given Delp nothing but “grief.”
On or about March 15, 2007, the defendants spoke with Micki Delp. Shortly after the conversation between Micki Delp and the defendants, Fee sent an email to Scholz’s publicist reporting what Micki Delp had told her—"she says Brad was in despair because Fran Cosmo was disinvited from the summer tour"— and asked her for a comment. Scholz responded that the firing of Fran Cosmo had been a group decision.
On March 16, 2007, the defendants wrote and published the second article, based on the conversation with Micki. According to testimony by Micki Delp in 2011, the statements attributed to her in quotes were accurate statements she gave the defendants.
The defendants wrote and published another article on July 2, 2007 relating to Delp’s suicide.
The March 15, 2007 article, titled: “Suicide Confirmed in Delp’s Death,” stated in relevant part:
Delp remained on good terms with both Tom Scholz, the M.I.T. grad who founded the band, and Barry Goudreau, Fran Sheehan and Sib Hashian, former members of Boston who had a fierce falling out with Scholz in the early ‘80s.
Delp tried to please both sides by continuing to contribute his vocals to Scholz’ Boston projects while also remaining close to his former bandmates. The situation was complicated by the fact that Delp’s ex-wife Micki, is the sister of Goudreau’s wife, Connie.
‘Tom made him do the Boston stuff and other guys were mad they weren’t a part of it,” said another insider. “He was always under a lot of pressure.”
[• • •]
Scholz' penchant for perfection and his well-chronicled control issues led to long delays between albums. As a result, Goudreau, Delp and Hashian released an album without him, which led to an irretrievable breakdown.
*317 [[Image here]]
But the never-ending bitterness may have been too much for the sensitive singer to endure. Just last fall the ugliness flared again when Scholz heard some of his ex-bandmates were planning to perform at a tribute concert at Symphony Hall for football legend Doug Flutie and then had his people call and substitute himself and Delp for the gig, sources say.
In fact, the wounds remained so raw that Scholz wasn’t invited to the private funeral service for Delp that the family held earlier this week.
“What does that tell you?” asked another insider. “Brad and Tom were the best of friends and he’s been told nothing about anything.”
On March 16, 2007, the front-page headline of the Boston Herald read, “PAL’S SNUB MADE DELP DO IT’ and in smaller print, “Boston Rocker’s Ex-Wife Speaks.” The article corresponding to the headline, in relevant part, states:
Boston lead singer Brad Delp was driven to despair after his longtime friend Fran Cosmo was dropped from a summer tour, the last straw in a dysfunctional professional life that ultimately led to the sensitive frontman’s suicide, Delp’s ex-wife said.
“No one can possibly understand the pressure he was under,” said Micki Delp, the mother of Delp’s two kids, in an exclusive interview with the Track.
“Brad lived his life to please everybody else He would go out of his way and hurt himself before he would hurt somebody else, and he was in such a predicament professionally that no matter what he did, a friend of his would be hurt. Rather than hurt anyone else, he would hurt himself. That’s just the kind of guy he was.”
Cosmo, who has been with Boston since the early 90s, had been “disinvited” from the planned summer tour, Micki Delp said, “which upset Brad.”
But according to Tom Scholz, the M.I.T.-educated engineer who founded the band back in 1976, the decision to drop Cosmo was not final and Delp was not upset about the matter. (Cosmo’s son Anthony, however, was scratched from the tour.)
“The decision to rehearse without the Cosmos was a group decision,” Scholz said in a statement through his publicist. “Brad never expressed unhappiness with that decision . . . and took an active part in arranging the vocals for five people, not seven.”
Nonetheless, according to the singer’s suicide notes released yesterday, Delp said that he had “lost my desire to live.”
Police said Delp sealed himself inside his bathroom last Friday, lit two charcoal grills and committed suicide via carbon monoxide poisoning.
“Mr. Brad Delp. J’ai une solitaire. I am a lonely soul,” said one of the notes. “I take complete and sole responsibility for my present situation.” The note also included instructions on how to contact his fiancée, Pamela Sullivan, who found Delp’s body.
“Unfortunately she is totally unaware of what I have done,” the note said.
Yesterday Sullivan, who was planning to marry Delp this summer, said the situation was “extremely painful” for her, Delp’s children and his family.
‘To the rest of the world, this is a big story,” she said. “But to Brad and Micki’s children and me, it’s very different.”
According to police reports released yesterday, Delp was found on the floor of his bathroom on Friday, his head on a pillow and a note paper-clipped to the neck of his shirt. He died sometime between 11:30 p.m. March 8 and the next afternoon.
Sullivan told police that Delp “had been depressed for some time, feeling emotional and bad about himself,” according to reports.
According to Micki Delp, Brad was upset over the lingering bad feelings from the ugly breakup of the band Boston over 20 years ago. Delp continued to work with Scholz and Boston but also gigged with Barry Goudreau, Fran Sheehan and Sib Hashian, former members of the band who had a fierce falling out with Scholz in the early ‘80s.
As a result, he was constantly caught in the middle of the warring factions. The situation was complicated by the fact that Delp’s ex-wife, Micki, is the sister of Goudreau’s wife, Connie.
“Barry and Sib are family and the things that were said against them hurt,” Micki said. “Boston to Brad was a job, and he did what he was told to do. But it got to the point where he just couldn’t do it anymore”.. .
The July 2, 2007 article, titled, “Delp Tribute On,” stated in relevant part:
The concert will include one number—the encore— during which the original members of the band Boston will reunite. The parties founderTom Scholz and the original members Barry Goudreau, Sib Hashian and Fran Sheehan with Fran Cosmo on vocals have been at odds for decades and the lingering bad feelings from the breakup of the original band more than 20 years ago reportedly drove singer Delp to take his own life in March.
It is the gist of these statements that caused the plaintiff to file suit: the plaintiff believes these articles blame him for Delp’s suicide.
DISCUSSION
Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on each relevant issue and that the summary judgment record shows the party is entitled to judgment as a matter of law. *318 Pederson v. Time, Inc., 404 Mass 14, 16-17 (1989). The moving party may satisfy this burden by demonstrating that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Comm’n Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 710 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact.” Pederson, 404 Mass. at 17. The court views the evidence in the light most favorable tothe nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995).
The defendants present several arguments in support of their Motion for Summary Judgment. They claim that Scholz is precluded from bringing this action by collateral estoppel. Scholz first proceeded against Micki Delp; that lawsuit was consolidated with the present matter. Another judge of this court granted summary judgment to Micki Delp on the grounds that the statements were not “of and concerning” Scholz, the statements were not reasonably susceptible of a defamatoiy meaning against Scholz, and there was no clear and convincing evidence that the statements were made by Micki Delp with any doubt as to their truth. The defendants argue that Scholz is collaterally estopped from pressing this claim as a matter of law.
Scholz counters by claiming that Judge Cratsley’s ruling was limited to Micki Delp’s statements, and not those contributed by the defendants. Scholz claims that if this court were to look at the articles as a whole, including headlines, then a jury could conclude that the articles were of and concerning Scholz and could be read to have a defamatoiy impact.
Also, the defendants claim that summary judgment is appropriate under the five Constitutionally-based tests that they propose.[2]
First, the defendants claim that Scholz cannot meet the burden of establishing that the statements were of and concerning Scholz, because he was not mentioned by name, and no reasonable reader could interpret that the statements were about him. Scholz counters by alleging that not only could a reasonable person make the interpretation that the statements were of and concerning Scholz, but readers did in fact, make the interpretation based on the statements and the articles taken as a whole.
The defendants next claim that Scholz cannot pass the second mandated test: that the statement can be reasonably construed as defamatory to Scholz. The defendants argue that the article provides substantially correct facts and leaves it to the reader to draw his or her own conclusions. Scholz counters by claiming that, taking the articles as a whole, a reader could interpret them as implications that Scholz caused Brad Delp’s suicide. Scholz further alleges that because the communication is susceptible of defamatoiy and non-defamatory meaning, a question of fact has arisen, and as such summary judgment does not lie. Next, the defendants allege that, even assuming the first two tests are decided adversely to them, the statements were not objectively verifiable, meaning they are incapable of being proven false, and therefore are protected by the Constitution as they are opinions. Scholz counters by claiming that the statements were opinions based on false facts which are not protected. Scholz claims that the Herald attributed the statement to Delp’s family and friends giving the impression that the articles were based on fact. Also, Scholz "argues that all of the attributed statements, were in fact, false.
Further, defendants claim the plaintiff cannot prove that the Herald published these three articles with a high degree of awareness at the time that they were false. Plaintiff responds claiming evidence that these articles were written with actual malice or a reckless disregard of the truth.
Finally, the defendants allege that summary judgment should be granted as Scholz has no reasonable expectation of proving his claim for intentional infliction of emotional distress as all of his symptoms of distress were caused by conditions he suffered from well before the publication of any of the articles. Scholz counters by claiming that the symptoms were reactivated by the publication of the articles and it is, therefore, a question to be decided by the jury.
I. COLLATERAL ESTOPPEL
The defendants point out that Scholz consolidated his claim against Micki Delp (for defamation) with his claim against the defendants by arguing that both claims “squarely involve the same facts and issues of law.” When the court (Cratsley, J.) granted summary judgment by ruling that Micki Delp’s statements published in the Herald were non-actionable, Scholz was estopped by issue preclusion, they argue.
In order to establish issue preclusion, the defendants must show that the issue of fact sought to be foreclosed was actually litigated in a prior action and determined by a final judgment, and that determination was essential to the judgment. Taper v. North Adams Ambulance Service, Inc., 428 Mass. 132 (1988). A judgment is final for purposes of issue preclusion, regardless of the fact that it is on appeal. O’Brien v. Hanover Ins. Co., 427 Mass. 194 (1998).
The court (Cratsley, J.) ruled that the six quoted statements made by Micki Delp were non-actionable; these all appeared in the March 16 article. Thus, the plaintiff correctly points out that Judge Cratsley rendered no decision regarding the March 15, 2007 nor the July 2, 2007 articles. In addition, the decision rendered regarding the statements in the March 16, 2007 article was limited to the statements attributed to Micki Delp, not the entire article. The court observed that “[wjhile the article as a whole could be read by some to contain a defamatory meaning as to Scholz because of the possible leap or inference a reader *319 might make that turmoil in Brad’s professional life possibly caused by Scholz, played a role in Brad’s suicide, none of the statements attributed to Micki make that connection, either explicitly or implicitly.”
This court must now determine whether all three of the articles published by the defendants are defamatory. Examination of the entirety was not required in the litigation between the plaintiff and Micki because that issue was limited to whether any of the six statements attributed to her were defamatory. Here, the analysis requires this court to examine each article as a whole, all the words used, including headlines. Foley v. Lowell Sun Pub. Co., 404 Mass 9, 11 (1989).
Because that issue was not litigated in the companion action, there is no preclusive effect in the present action. Treglia v. MacDonald, 430 Mass. 237, 241 (1999).
II. DEFAMATION
To withstand a motion for summary judgment for defamation, Scholz must demonstrate that (1) the defendants made a false and defamatory statement “of and concerning” Scholz to a third party; (2) the statement could damage Scholz’s reputation in the communily; (3) the defendants were at fault for making the statement; and (4) the statement caused Scholz economic loss or is actionable without proof of economic loss. Ravnikar v. Bogojavlenslqj, 438 Mass. 627-30 (2003). A statement on matters of public concern must be provable as false where a media defendant is involved. Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990).
A. Defamatory Connotation
The threshold inquiry is whether the statements are reasonably susceptible of a defamatory meaning and that determination is a question of law for the court. Foley v. Lowell Sun Pub. Co., 404 Mass. 9, 11 (1989). A statement is defamatory when, “whether in the circumstances, the writing discredits the plaintiff in the minds of any considerable and respectable class of the community.” Brauerv. Globe Newspaper Co., 351 Mass. 53, 55 (1966). The statement must be one that “would tend to hold the plaintiff up to scorn, hatred, ridicule, or contempt, in the minds of any considerable and respectable segment in the community.” Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 853 (1975). Certainly, had the defendants explicitly stated that the plaintiff caused Brad to commit suicide, the plaintiff would survive summary judgment. However, a searching examination of all three articles reveals no such statement. Instead, the plaintiff asks this court to look at the articles as a whole and see within them the implication that the plaintiff was responsible for Delp’s suicide.
A defamation claim may stand when inferences which might be drawn from a statement tend to discredit the plaintiff in the minds of the community. King v. Globe Newspaper Co., 400 Mass. 705, 718 (1987). The court looks at the statement in “its totality in the context in which it was uttered or published.” Foley, 404 Mass, at 11. This requires the court to examine all the words used and the headlines. Id. There is no support in Foley, however, for the proposition that this court must mass all three articles together as a single statement. That would not reflect the experience of the readership; each edition of the newspaper is a standalone proposition. Therefore, this court will examine each, in its totality, to determine whether any or all of the articles are defamatoiy.
The defendants are correct in that articles which are merely undesirable, or unhelpful to the band’s image, are not actionable. But taking the facts in. the light most favorable to the plaintiff, Scholz alleges that others read the statements in all three articles as insinuations that the plaintiff caused Delp to commit suicide. “(DJefamation can occur by innuendo as well as explicit assertion.” Reilly v. Associated Press, 59 Mass.App.Ct. 764, 774 (2003).
The March 15, 2007 article led with the facts provided by police, and quoted the family’s statement. In part, they had said Brad Delp “gave as long as he could, as best he could, and he was very tired.” The article then quoted unnamed friends who said his “constant need to help and please people... may have driven him to despair.” This was followed by the declarative statement: “He was literally the man in the middle of the bitter breakup of Boston—pulled from both sides by divided loyalties.” This was followed by two short paragraphs detailing his man-in-the-middle situation. Another insider was then quoted: ‘Tom made him do the Boston stuff and the other guys were mad that they weren’t part of it ... He was always under a lot of pressure.”
Without explicitly so stating, the defendants used Delp’s conflicted Boston relationships to fill in the ellipses in the family’s statement. Thus, they, in effect, suggested that Brad Delp had given to his friends on both sides of the Boston divide “as long as he could, as best he could, and he was very tired,” The implication was clear; the Inside Track thought Delp was exhausted by his efforts to please his bandmates.
Then the article turned to Scholz: his “penchant for perfection and his well-chronicled control issues”; “too much to endure”; and “ugliness flared again” when Scholz displaced the Goudreau-Hashian group at a benefit. Four paragraphs of negative commentary about Scholz were followed by: “the wounds remained so raw that Scholz wasn’t invited to the private funeral service for Delp.” While not explicit, the implication that Scholz was the cause of Delp’s suicide was inescapable due to artful placement of information. The placement suggested a nexus and causation.
Similarly, the March 16, 2007 article begins by attributing to Micki Delp the statement that her ex-husband was “driven to despair” when his back-up singer Fran Cosmo was dropped from Boston. He would, she is quoted as saying, “hurt himself before he would hurt somebody else and he was in such a predicament professionally that no matter what he *320 did, a friend of his would be hurt.” Scholz’s publicist is next quoted in denial of the “disinvitation” but the following sentence discredits the denial: “Nonetheless . . . Delp said he had ’’lost [his] desire to live." The article then rehashes the facts from the police report and the middleman status of Delp according to his ex-wife, Micki. Moving toward the conclusion, the article quotes Micki again: “Boston to Brad was a job, and he did what he was told to do. But it got to the point that he just couldn’t do it anymore."
The understandable effort by Micki to explain her ex-husband’s suicide did not place blame on Scholz. But by clever tying of these pieces of information together in the same article, the Herald and its writers implied that Scholz’s dropping of Cosmo drove Delp to despair, to the point where he could not do his job anymore, and to where he would hurt himself. This is all pre-figured by the headline: “Pal’s Snub made Delp do it: Boston Rocker’s ex-wife speaks.” In totality, the article and headline would warrant a reasonable person’s inference that the plaintiff was responsible for the act which “caused” in whole or in part Delp’s suicide.
The July 2,2007 article is brief. It reported that “the lingering bad feelings from the breakup of the original band more than 20 years ago reportedly drove singer Delp to take his own life in March.” While the conflictual history of the group is not recounted, those in the music community would have been warranted in identifying the plaintiff as the cause of the bitterness and the situation which led to Delp’s suicide. This article is the first which expressly sets forth Boston as the reason for Delp to take his own life. It pointedly summarizes the March 15 and 16 articles, and proves the defamatory innuendo of all three.
For the above stated reasons, this court finds that all three articles contain statements reasonably susceptible of a defamatory meaning.
B. “Of and Concerning” the Plaintiff
The next issue is whether the statement referred to the plaintiff or could be reasonably read in the context as pertaining to the plaintiff. Godbout v. Cousens, 396 Mass. 254, 264 (1985) (determining whether the article refers to the plaintiff is a question of fact which may be evaluated in light of the facts and circumstances attending publication). There are two alternative tests to determine whether a statement is “of and concerning” the plaintiff: one subjective and one objective. Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 430-31 (1991). The subjective test inquires as to whether the defendants intended the statements to refer to the plaintiff. Id. at 430. The objective test inquires as to whether the statement could reasonably be understood to refer to the plaintiff. Id.
In the present matter, whether the statements in any of the three articles were “of and concerning” the plaintiff must be left to the juiy. A defamation plaintiff must prove that the defendant’s words are “of and concerning” the plaintiff. To do so, the plaintiff must prove either that the defendant intended their words to refer to the plaintiff and that they were so understood, or that the defendant’s words reasonably could be interpreted to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood. New England Tractor-Trailer Training of Connecticut, Inc. u. Globe Newspaper Co., 395 Mass. 471, 483 (1985).
As observed in the discussion on defamatory connotation, Tom Scholz was named in the articles, along with others, but only his personal history as leader of the band was woven through the suicidal mental state of Brad Delp. A reasonable person could determine that the articles were of and concerning Scholz. Plaintiff has raised genuine issues of material fact which preclude the entry of summary judgment on this element.
C. Whether the Defamatory Connotation Is One of Fact or of Non-Actionable Opinion
“Statements of fact may expose their authors or publishers to liability for defamation, but statements of pure opinion cannot. Statements of pure opinion are constitutionally protected.” King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987). In determining whether a challenged statement is fact or privileged opinion, a question of law is presented if reasonable people could not decide the matter differently, while a jury question is posed if the statement could reasonably be understood either way. King at 709. “In deciding whether statements can be reasonably understood as fact or opinion ‘the test to be applied . . . requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement, including the medium by which the statement is disseminated and the audience to which it is published.’ ” Driscoll v. Board of Trustees of Milton Academy, 70 Mass.App.Ct. 285, 297 (2007), quoting Cole v. Westinghouse Bdcst Co., 386 Mass. 303, 309 (1982).
Pure opinions are those based on disclosed or assumed non-defamatory facts, and are not actionable at law. National Ass’n of Government Emp., Inc. v. Central Broadcasting Corp., 379 Mass. 220,226 (1979) (holding that the defendant’s statements that the plaintiff was a “communist” and was infringing on the right to free speech was an opinion based on disclosed facts, and therefore was not actionable). The libel sought to be addressed in plaintiffs complaint is that “the public has now been left with the false understanding that Mr. Scholz drove Mr. Delp to such despair that he committed suicide on March 9, 2007.” As plaintiff sees it: “Herald conveys that Scholz was Responsible for Brad’s Suicide,” see Plaintiffs Memorandum of Law in Support of Opposition to Motion for Summary Judgment at 8.1.
The plaintiff challenges the headline: “Pal’s Snub made Delp do it: Boston Rocker’s ex-wife speaks,” and *321 the implicit assertion (Scholz was responsible) within the March 16 article. The primary question is whether the words themselves taken in their natural sense and without a forced or strained construction can be understood as stating a fact. Myers v. Boston Magazine Co., Inc., 380 Mass. 336, 341 (1980). The test for that is whether the challenged language can reasonably be read as stating a fact. Id. at 340.
This court concludes that no reasonable reader would understand that the insinuation running through all three articles that the plaintiff was responsible for Brad Delp’s suicide was an assertion of fact. Any reader would reasonably take this assertion to be an opinion on the mental state of a now-deceased person. As noted above, suicide is a tragedy for many reasons, one being the lingering question of “why?” with which the survivors must grapple. This is a common human understanding. No one ever knows what actually motivated the person to end his life. Considering the context of the article, presented as insider information (“gossip” if you will) about entertainment celebrities, it would only be reasonably perceived as an opinion held by a person or persons with some familiarity with the situation. No other interpretation is reasonable.
Another means of distinguishing fact from opinion statements is whether the defamatory statements are capable of being proven true or false, objectively and verifiably. Statements which cannot be proven false cannot be characterized as assertions of fact. Cole v. Westinghouse Broadcasting Co., Inc., 386 Mass. 303, 312 (1982). “Only statements that are provably false are actionable.” VeiRewcv. Nat'lBroad. Co. 206F.3d92 108 (IstCir. 2000).
In this court’s view, it would be impossible for plaintiff to disprove the proposition that Scholz caused Delp to take his own life, as he would be required to do in order to establish the falsity of the proposition.
Brad Delp was the only source of information as to his true motivation at the moment he ignited the two charcoal grills; he is no longer available. He may well have been motivated by his own shame and humiliation because of his invasion of Meg’s privacy and he may well have been depressed about the bitter band breakup, his relationship with Scholz, or the pressure of singing without Cosmo. Anyone other than the deceased is capable only of harboring an opinion as to whether any of these reasons were the whole or partial grounds for his suicide. But because no one will ever know the dead man’s final mental state, it is only an opinion.
The plaintiff brushes aside this position by pointing out that mental states are proven every day in criminal courtrooms across the Commonwealth. He does so on the basis of dicta in a defamation case. “A given state of mind is a fact that can be proved like any other and, indeed, is proved in every criminal prosecution.” Tech Plus, Inc. v. Ansel, 59 Mass.App.Ct. 12, 22-23 (2003). The quote is inapposite.
In a criminal case, twelve jurors must unanimously agree whether the Commonwealth has proved a specific intent (to kill, to rob, to maim) beyond a reasonable doubt, often based on circumstantial evidence. In a discrimination case, it must be shown that the defendant held a discriminatory animus. Each of the jurors must form an opinion as to the existence of a mental state in the defendant based on the evidence; for a conviction, that opinion must be unanimous and held to a moral certainty. It cannot be gainsaid that the jurors, too, are capable only of opinions.
Here, the plaintiff is obligated to factually disprove a mental state, not satisfy ajuiy that a mental state existed. Scholz is compelled to prove that Delp was actually and factually not motivated—at all—by concerns for which Scholz was responsible. In other words, Scholz must disprove Delp’s mental state vis-a-vis Scholz.
Statements on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved. Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990).[3] It will not be enough to bring the jurors to an opinion as to what caused Delp to take his own life; that won’t be a question put to the juiy. Instead, the plaintiff is obligated to factually prove that Scholz was not in Delp’s mind at all at the fatal moment. It is not that it is a difficult proposition to disprove that is controlling; it is that it is an impossible proposition to disprove. The proposition is not objectively verifiable.
Plaintiff counters that, if this is an opinion, it is a “mixed” opinion. Mixed opinions are those based on facts which have not been disclosed or assumed to exist, and may be defamatory if they can be reasonably understood to be based on undisclosed defamatory facts. Restatement, 2d, Torts §556, Comment c. The defendant has not raised ajuiy issue that the articles rested on undisclosed defamatory facts. The bases of the inference were fully disclosed. Indeed, the bases of the inference constituted the articles.
The statements made by Micki Delp were fully disclosed in the March 16, 2007 article. Those statements have been endorsed by her. This judge agrees with the ruling of the previous court (Cratsley, J.) that considered the case and deems Micki Delp’s statements non-defamatory on the same reasoning. Moreover, everything that Micki Delp said was her opinion of her ex-husband’s situation based on conversation and observation. Disclosure of the opinions of Micki and others as the basis of the opinion/inference provided by the Herald gave the reader the opportunity to make up his own mind in assessing whether the defendants’ published statement offered a valid opinion as to the cause of Delp’s suicide.
The March 15, 2007 article attributed the information regarding the band’s breakup to an unnamed source. Those statements of “friends” and “insiders” standing alone, solely regard the mental state of Delp *322 and are not “of and concerning” Scholz. Again, these are opinions. ‘The meaning of these statements is imprecise and open to speculation.” Cole v. Westinghouse Broadcasting Co., Inc., 386 Mass. 303, 312 (1982). Equipped with these disclosed non-defamatory statements, a reader could discern for himself whether Delp’s connection to the band was the true source of the mental state described in the family’s statement (“he was veiy tired”) and was, or was not, the cause of Delp’s suicide. See Driscoll, 70 Mass.App.Ct. at 297 (holding that the school’s statement that a sexual situation involving five boys and one girl was based on pressure and coercion, was not defamatory because it was based on disclosed nondefamatoiy facts).
Moreover, despite the plaintiffs argument that these opinions were falsely attributed, this court is persuaded that there is no genuine dispute that the statements of Micki and insider/friends were actually made, and are still endorsed by them. That those individuals’ beliefs about Brad Delp’s mental state were opinions based on their conversations with him or observations is well-established by the factual record of the case, as to which there is no genuine dispute.[4]
Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142 (8th Cir. 2012), is directly on point. In Gacek, the plaintiff alleged defamation when the defendant told other employees that the plaintiff “pushed [the decedent] over the edge, and was the straw that broke the camel’s back and that was the reason for [the decedent’s suicide].” Id. at 1147. However, the court found that none of those statements expressed “objectively verifiable facts” about the suicide’s decision process. Gacek at 1147-48. Rather, they express another’s “theory” or “surmise” as to the suicide’s motives in taking his own life. Id. “[A]nyone is entitled to speculate on a person’s motives from the known facts of his behavior.” Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993).
There is no actionable claim of defamation because the plaintiff has no reasonable expectation of proving the statements were false, and they constitute non-actionable opinion. Thus, the court need not reach the remaining elements, including malice and reckless disregard.
III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
The claim of intentional infliction of emotional distress is entirely derivative of the central claim of defamation as it is based on the same articles. Therefore, summary judgment must be allowed on this claim; it has no separate footing. LaChance v. Boston Herald, 78 Mass.App.Ct. 910, 910 (2011). The claim will be discussed briefly.
In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause or should have known that his conduct would cause, emotional distress; (2) the defendant’s conduct was extreme and outrageous; (3) the defendant’s conduct caused the plaintiffs distress; and (4) the plaintiff suffered severe distress. Cosy v. Marcella, 49 Mass.App.Ct. 334, 340 (2000), quoting Sena v. Commonwealth, 417 Mass. 250, 263-64 (1994). Assuming arguendo that the plaintiff could prove that the defendants intended to cause the plaintiff emotional distress, summary judgment for the defendant would still be warranted as the plaintiff could not prove the extreme and outrageous element. To satisfy that element, the plaintiff must show that the defendants’ conduct was “beyond all possible bounds of decency and of a nature that no reasonable person could be expected to endure it.” Howell v. Enterprise Publishing Co., 455 Mass. 641, 672 (2010). Where this court has ruled that the statements published by the defendants were not defamatory, it cannot be inferred that the publication of such statements is extreme and outrageous.
Moreover, even assuming the extreme and outrageous element was satisfied, the plaintiff has no reasonable expectation of proving causation or damages. The plaintiff has suffered from a variety of ailments since before March 2007. It is the symptoms of these same ailments that the plaintiff alleges was caused by the defendants. Caputo v. Boston Edison Co., 924 F.2d 11, 14 (1st Cir. 1991) (affirming summary judgment on IIED claim where plaintiffs depression pre-dated the defendant’s actions). Because the plaintiffs ailments are identical to ailments he had prior to the publication of the articles, the plaintiff has no reasonable expectation of proving that the publication caused them.
CONCLUSION AND ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ Motion for Summary Judgment be ALLOWED. Judgment is to enter for the defendants on both counts.

 fyamily members are referred to by given names for the sake of clarity.

he defendants cite no one case for their five Constitutionally-based factors. However, this court recognizes their five factors as correct propositions of First Amendment law applicable to defamation cases against media defendants.

The court recognizes that Delp’s suicide was a private tragedy. However, he had become an entertainment celebrity, a public figure for the purpose of the band Boston, and his death was a matter of public interest. His family prepared a public statement in this regard. While not an issue of public safety or the public fisc, for the public who cared about him during his life, his death was an issue of public concern.

The plaintiff denies that Micki Delp made the statements attributed to her. This judge has ferreted through the plaintiffs opposing statements in the record to examine the source of that denial. This court has reviewed the 2008 deposition of Micki Delp and finds she disclaimed only two sentences in which her comments were paraphrased. Plaintiff has no reasonable expectation of now proving that Micki Delp did not make the statements that she says she made, and stands by.